UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CATHERINE VAN ARNAM, et al.,          )
            Plaintiffs,               )
                                      )
            v.                        )    CIVIL ACTION NO.
                                      )    00-10879-DPW
GENERAL SERVICES ADMINISTRATION,      )
et al.,                               )
            Defendants.               )


MEMORANDUM OF
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND ORDER FOR JUDGMENT
August 27, 2004

    Having previously addressed the claims in this action in
summary judgment practice and found trialworthy issues regarding
(a) procedural questions of standing and mootness and (b) the
substantive question of the constitutionality of conditioning
permits to demonstrate at Boston's John F. Kennedy Federal
Building upon the execution of an indemnification/hold harmless
provision, Courtemanche v. GSA, 172 F. Supp. 2d 251 (D. Mass.
2001), I now address the remaining claims following trial.  In
order to make the findings and conclusions in this Memorandum
self-sufficient and comprehensive in their own right without the
need to cross-reference the earlier summary judgment decision, I
have imported portions of the summary judgment opinion verbatim
in this Memorandum.  With apologies for some necessary repetition

-1-

between the two opinions, I turn to the findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

## I.  INTRODUCTION

One who wishes to use federal property administered by the General Services Administration ("GSA") must first obtain a license.  The license application requires that the applicant agree to "indemnify and save harmless the United States, its agents and employees against any and all loss, damage, claim or liability whatsoever" due to exercise of the license.

Plaintiff Catherine Van Arnam, née Courtemanche,[1] applied for such a license in May 2000 to use space immediately outside the John F. Kennedy Federal Building ("JFK Building") in Boston as part of a loosely organized national effort to protest the impending return of Elian Gonzalez to Cuba.  A subordinate GSA official initially denied the application on grounds that the intent of the proposed event was to influence a federal appellate court hearing scheduled for the next day in Atlanta.  On administrative appeal within GSA, the judicial proceedings ground was abandoned by a senior GSA official, who nevertheless declined to grant the license because Van Arnam refused to sign the

_____

[1]During the course of this litigation, Catherine Courtemanche married and became Catherine Van Arnam.  In recognition of plaintiff's name change, and to distinguish this opinion from that issued to resolve summary judgment (in which plaintiff was identified by her former name, Courtemanche), for consistency within this Memorandum I will refer to plaintiff as Catherine Van Arnam.

indemnification/hold harmless clause.  Van Arnam thereafter
conducted her protest on City of Boston property adjacent to the
JFK Building.

After the protest, Van Arnam continued to press the
declaratory judgment action that she had initiated before the
protest to contest GSA's denial of her application.  She
initially challenged both the judicial proceedings provision and
the indemnification/hold harmless provision as unconstitutional
burdens on her First Amendment rights.  Defendants, in addition
to defending the provisions on the merits, also asserted that the
challenge by the individual plaintiff and her co-plaintiff,
Americans to Keep Elian Free, were procedurally defective.

I granted the government's motion for summary judgment as to
the judicial proceedings provision, but denied it as to the
procedural and the indemnification/hold harmless clause issues.
I then conducted a two-day bench trial, on the basis of which I
enter the following Findings of Fact and Conclusions of Law in
support of judgment for Van Arnam.

## II.  FINDINGS OF FACT

## A.    The Parties

Plaintiff Van Arnam was the Boston Coordinator for Americans
to Keep Elian Free.  Plaintiff Americans to Keep Elian Free was a
grassroots organization formed for the purpose of organizing
nationwide demonstrations on one particular day to support the

rights of Elian Gonzalez in an effort to prevent his return to Cuba.  The organization no longer exists.

The defendant General Services Administration is the federal agency that administers much of the property owned by the United States.  GSA's National Administrator and the Director of the Program Operations Division at the Boston office are also named as defendants.  For simplicity, I will refer to the defendants collectively as "GSA" or "the government."

**B.    The License Terms**

To request a license to use federal property administered by GSA, parties must fill out a standard GSA application, Form 3453 ("Application/Permit for Use of Space in Public Buildings and Grounds"), detailing various aspects of the proposed use, including the time, date, and number of people expected.  Every applicant must also execute an indemnification/hold harmless clause ("the Clause"), which is on the second page of GSA's application form and requires a separate signature assenting to the terms.  The Clause states that:

> The licensee shall indemnify and save harmless the
> United States, its agents and employees against any and
> all loss, damage, claim or liability whatsoever, due to
> personal injury or death, or damage to property of
> others directly or indirectly due to the exercise by
> the licensee of the privilege granted by the
> obligations of said license.

The application also provides that:

> The applicant assumes all responsibility for clean-up
> of the grounds, for providing trash containers, and for

arranging disposal of the trash.  The Federal
Government cannot provide electricity for operation of
the applicant's equipment, nor are restrooms and
similar facilities available.  If necessary, portable
restroom facilities may be authorized, at the
applicant's expense, if the applicant arranges for the
removal before the beginning of the next workday.

All licenses issued for the use of space immediately outside
the JFK Building have contained an applicant's signature on the
Clause.

**C.    The JFK Building and Surrounding Area**

The JFK Building is a large federal office building complex,
oriented roughly southwest-northeast, at the northern end of the
Government Center section of downtown Boston.[2]  Its southeastern
side faces the expansive City Hall Plaza, and its southwestern
side faces Cambridge Street.[3]

Between the building's front entrance and Cambridge Street,
there is a small open plaza.  Only part of this property is
federally owned.  The distance from the building's lobby-level
windows to the southwestern federal property boundary is

_____

[2]The development of the design for the JFK Building and
adjacent plaza is detailed by David A. Crane, The Federal
Building in the Making of Boston's Government Center: A Struggle
for Sovereignty in Local Design Review, in Federal Buildings in
Context: The Role of Design Review 21 (J. Carter Brown ed.,
1995), and Norman C. Fletcher, The John F. Kennedy Federal Office
Building in Boston, in Federal Buildings in Context, supra, at
39.

[3]Cambridge Street does not run precisely north-south but
rather gently curves convex to Government Center, such that it is
almost exactly north-south at the southern end of Government
Center, and nearly east-west at the northern end of Government
Center, where the JFK Building is located.

approximately eighty-six feet.  A portion of that distance is actually under the building's upper floors, which extend farther to the west than the lobby level and which are supported by ten columns.  The distance from the northwestern property line to the southeastern property line in this area is approximately 263 feet, most of which is occupied by the building itself.  The building lies very close to the southeastern property line.

The area of the plaza southwest of the JFK Building and on federal property ("JFK Plaza") is approximately half an acre. Some 3,000-4,000 people per day enter the JFK Building via the Cambridge Street exit; as of December 2000, the average was 3,500 people per day.

No clear barrier marks the federal property line, but in most sections it is discernible to the trained eye.  Along the southwestern (Cambridge Street) side, approximately half of the 263 foot boundary coincides with two raised planter beds, approximately waist high, at either end of the boundary, though the central portion of the property line is unobstructed.[4]  Along the southeastern (City Hall Plaza) side, the boundary coincides with a change in surface and a series of widely-spaced waist-high cylindrical barriers, although both these features are also found

---

[4]Although this was not the subject of evidentiary development at trial, I note the federal property is now in the process of alteration to install security enhancements, principally in the form of "street furniture" and "bollard" fixtures designed to deter motor vehicle intrusions.

within the western portion of the federal property and there do not delineate any boundary.  Within the federal property, the plaza facing Cambridge Street is generally open except for the planter beds and two large ventilation cones approximately six feet tall and considerably larger in diameter.

The property bordering JFK Plaza is owned by the City of Boston.  City Hall Plaza is administered by the City's Assistant Commissioner of Real Property, and the sidewalk between Cambridge Street and the southwestern federal property line is administered by the City's Transportation Department.

**D.    Public Use of JFK Plaza**

Before the planned Americans to Keep Elian Free demonstration that Van Arnam sought to conduct, a variety of public events had taken place at JFK Plaza with GSA permission. Between October 1997 and February 2002 GSA granted applications for permission to use the site for at least six political or expressive events: a "cultural event" organized by the American Friends Service Committee; a press conference regarding trade bills in the Senate organized by the Union of Needletrades, Industrial, and Textile Employees; a public demonstration for a solution to the conflict between Eritrea and Ethiopia; an art exhibition; a rally relating to the United States policy toward

the Congo; and a fast and press conference supporting "the Louis Gutierrez bill."[5]

Through the permits, GSA imposed numerous "special conditions" on the groups organizing these events.  The AFSC was required to "remove all debris and trash."  The UNITE press conference was "limited to the north west corner of the plaza area on the black top" and required to "not interfere with the entrance or exit of employees or the public."  The Eritrea-Ethiopia demonstration was similarly "restricted to the northwest corner," required "not to block [the] entrance," and limited to 200 people.  The Congo policy rally was limited to the "north west corner of Cambridge & New Sudbury Street on the black top area only," and the applicant was expressly made "responsible for all clean up, and any damage to Federal Property."

**E.    The "Elian" Application**

On May 1, 2000 Van Arnam filed an application for a permit to hold a fifty-person demonstration regarding Elian Gonzalez on JFK Plaza on May 10, 2000.[6]  This was the first time that she had ever organized a demonstration or applied for a permit to use

---

[5]Permits were also granted for apparently non-expressive events, including a one-day Christmas sale.

[6]Her application stated that she intended to hold the demonstration at the "JFK Federal Building, corner of Cambridge and New Chardon Streets."  This was a geographic error.  The JFK Building borders New Sudbury Street to the north; it does not border New Chardon Street at all.  New Chardon Street is parallel to New Sudbury Street, but one block further north.  Despite this error, plaintiff's intent was clear.

space for a demonstration or rally.  The United States Court of Appeals for the Eleventh Circuit was scheduled to hear oral argument in the Elian Gonzalez matter in Atlanta, Georgia on May 11, 2000, and Americans to Keep Elian Free was coordinating simultaneous rallies in several cities.  Van Arnam selected the JFK Building as the demonstration site because the Immigration and Naturalization Services offices were located there, and because Americans to Keep Elian Free local coordinators in other cities targeted federal office buildings.

Under "Description of Proposed Activity," Van Arnam's permit application stated, "This will be a peaceful rally in support of Elian Gonzalez' individual rights.  We will be waving American flags and singing patriotic American songs."  As part of her initial application, Van Arnam signed the Clause.

On Wednesday, May 3, 2000 Michael Franzese, the Building Manager of the JFK Building, notified Van Arnam by letter that her request for a permit was denied, stating:

> In accordance with the Federal Property Management Regulations, Section 101-20.404 Paragraph 4 'GSA shall disapprove or cancel any application if ... [t]he proposed use is intended to influence or impede any pending judicial proceeding.'  Based on the information provided with your application and conatined [sic] on your web page the event was scheduled to be held the day before the 11th Circuit Court of Appeals Hearing.

After receiving this denial, plaintiff contacted counsel.  On Friday, May 5, 2000 she faxed a letter to defendant Karen Palladino, Director of Program Operations for GSA in Boston,

appealing the denial of the May 3 application.

Van Arnam also became concerned about her potential personal liability from the Clause.  After communicating with rally coordinators in other cities, she came to understand that the organizers of the Chicago Americans to Keep Elian Free protest had found a judgment-proof member to sign the Clause. Van Arnam made some very general inquiries into the possibility of obtaining special event insurance, and decided that she would not be able to afford such insurance,[7] but did not actually speak to an insurance agent or obtain a quote.  On Friday, May 5, 2000 she informed GSA's Office of Regional Counsel that she was withdrawing her assent to the Clause originally submitted with

_____

[7]Because Americans to Keep Elian Free was a loose and somewhat hastily organized project, it apparently had no funds. The plaintiff's total costs for the event were somewhat over $100, part of which was reimbursed by individual donations.

In May 2000, Van Arnam fell within what might be characterized as the working class.  The best evidence of her financial situation as of May 2000 is her 1999 and 2000 W-2 forms, and her 1999 Form 1040EZ, which were submitted under seal. Van Arnam – whose occupation was "desktop publisher" in 1999 and "executive secretary" in 2000 -- earned an income that, while well above poverty, was sufficiently modest that in the rather expensive Boston area, even as a single person, she could have qualified for low/moderate income housing.  Based on her actual income figures and the cost of living in this area, I find that Van Arnam's income as of May 2000 was (1) high enough that she would be substantially deterred by the prospect of unlimited personal liability -- i.e., she had reason to fear the enforcement of the Clause against her personally -- yet (2) low enough that she would also be substantially deterred by a $1,000 insurance premium, which she could not realistically afford.  In sum, I find, based on her financial situation, that the Clause deterred Van Arnam from conducting a demonstration on GSA property.

her permit application.

By letter dated Monday, May 8, 2000 Palladino notified Van Arnam that GSA would be able to issue a permit for the rally, but that Van Arnam's rescission of her agreement to the Clause rendered the permit application defective. Accordingly, Palladino informed Van Arnam that GSA was denying her permit application because of her refusal to sign the Clause. GSA's Regional Counsel informed Van Arnam's counsel that day, however, that GSA would grant the permit if the defect -- her refusal to sign the Clause -- was remedied.

On May 8, 2000 -- the day she received Palladino's letter -- Van Arnam filed this complaint seeking declaratory and injunctive relief against the judicial proceedings and indemnification/hold harmless clauses on May 8, 2000. On Tuesday, May 9, 2000 I allowed her motion for a preliminary injunction requiring issuance of the license on the condition that, without prejudice to her challenge, she would assent to the Clause in order to maintain the respective positions of the parties pending this litigation. Van Arnam unsuccessfully appealed that interlocutory ruling to the Court of Appeals for the First Circuit.

Because Van Arnam continued to refuse to assent to the indemnification/hold harmless requirement, Americans to Keep Elian Free was unable to hold its rally on the JFK Plaza. In conjunction with her application to GSA, however, Van Arnam had also applied for, and received, a permit from the City of Boston

to use City Hall Plaza as "spillover space" for the rally.  She also received a permit from the Boston Transportation Department to use the sidewalk in front of City Hall.[8]  Neither the City of Boston nor its Transportation Department required Van Arnam -- nor applicants in general -- to obtain insurance or sign an indemnification/hold harmless provision of any sort.

The May 10, 2000 rally in Boston was ultimately held on the portion of City Hall Plaza immediately adjacent to the JFK Building.  The rally was conducted without incident, although Van Arnam witnessed an unidentified man with a bleeding forehead walking around and shouting at her fellow demonstrators. Photographs reveal that the southeastern face of the JFK Building was clearly visible from the demonstration site, as was a large sign on the western portion of the federal parcel, but facing southeast towards City Hall Plaza, that reads "John Fitzgerald Kennedy Federal Building."  Because the building lies quite close to its southeastern boundary, the demonstrators were lawfully able to stand quite close to the JFK Building.  Average persons standing where the demonstration was conducted, and unaware of the precise boundaries or this dispute, would probably not realize that they were not on federal property, though they would certainly realize that they were not immediately in front of the entrance to the building, and therefore presumably less visible

---

[8]These permits were issued on May 1 and May 3, 2000 respectively.

to the building's users.

**F.    Special Event Liability Insurance**

The evidence indicates that special event liability insurance, which would cover much though not all of the liability potentially imposed by the Clause, was generally available in May 2000.  According to Michael Rodman, a Chartered Property Casualty Underwriter originally retained by the government and adopted as an insurance expert for the court, comprehensive special event liability insurance that was available in Massachusetts in May 2000 would have covered claims or suits arising from the Clause, subject to "standard policy exclusions."

Insurers set the premiums for special event insurance based in significant part on the subject matter of the event. According to Rodman, the premium depends on the insurer's assessment of the risks of injury and property damage, based on factors such as: the event sponsor's cause; exactly how the event will be carried out; the location and duration of the event; the number of participants and expected onlookers; and whether the subject matter or manner of communication are, in the underwriter's opinion, likely to be controversial.

It is difficult to ascertain, <u>post hoc</u>, what rate Van Arnam would have been quoted had she sought insurance for the Americans to Keep Elian Free rally.  The premium rates for special event liability insurance are not generally published, but would typically be at least equal to the insurer's "minimum premium," which would range from $1,000 to $2,500.

Based on the expert's affidavit and the fair inferences to be drawn from it, I find that insurers do take into account content- and viewpoint-based factors in setting special event liability premiums, and charge more for more controversial causes or topics.  Furthermore, I find that a special event policy sufficient to cover the risk for an event like the Americans to Keep Elian Free rally would have been available for not less than $1,000.  I further find that this premium would have been beyond the plaintiff's financial capacity.  <u>See supra</u> note 7.

**G.    Subsequent Events**

On June 28, 2000 Elian Gonzalez returned to Cuba, and Americans to Keep Elian Free dissolved.  Van Arnam, who was not a member of any other organizations that hold rallies or demonstrations, was not involved in any further rally organizing for some time.

On April 4, 2002, shortly before trial in this case was to commence, Van Arnam applied for a permit to use the Cambridge Street side of the JFK Building for a ten-person, one-hour rally

to show moral support for Israel at 9:00 AM on Saturday, April 13, 2002.[9]  The permit application was accompanied by a cover letter explaining that she had not signed the Clause, and did not intend to.  On April 10, 2002 Franzese denied her application on these grounds.  That same day Van Arnam appealed to Palladino, explaining that she refused to sign the provision because she believed it was unconstitutional.  On April 12, 2002 Palladino upheld the denial of the application.

### III.  CONCLUSIONS OF LAW

Van Arnam challenges the Clause on the basis that (1) though it is facially content-neutral, for practical purposes it is effectively content-based because different financial burdens are imposed on applicants based on the content (indeed, viewpoint) of their message, and (2) that the Clause's financial burdens on speech improperly discriminate against those unable to afford insurance coverage or financial risk of the magnitude that the Clause imposes.  GSA argues that (1) Van Arnam's challenge is non-justiciable under the doctrines of standing and mootness, and (2) on the merits, the Clause is a valid content-neutral regulation.  I address each of these arguments in turn.

---

[9]Before April 2002 Van Arnam had not been involved in Middle East political issues.  In fact, on Sunday, April 7, 2002 -- the weekend before the demonstration that Van Arnam sought to conduct -- a large, well-publicized pro-Israel demonstration was held at Faneuil Hall.  Van Arnam did not attend this rally because she did not know about it until after it was over.

A.    **Justiciability**

    1.    <u>Standing</u>

Article III of the Constitution limits the jurisdiction of federal courts to actual cases or controversies.[10]    <u>See</u> <u>Becker v.</u> <u>Fed. Election Comm'n</u>, 230 F.3d 381, 384 (1st Cir. 2000), <u>cert.</u> <u>denied</u> <u>sub nom.</u> <u>Nader v. Fed. Election Comm'n</u>, 532 U.S. 1007 (2001).  To establish standing to pursue such litigation, a plaintiff must show that: (1) she has suffered or is in danger of suffering some injury that is both concrete and particularized to her; (2) this injury is fairly traceable to the challenged action of the defendant; and (3) a favorable decision will likely redress the injury.  <u>Id.</u> at 385.

It is important to note at the outset that standing is to be "assessed under the facts existing when the complaint is filed." <u>Id.</u> at 387 n.3 (citations omitted).  There has been some confusion concerning the distinction between standing and mootness.  The First Circuit has clarified the issues, explaining that "while it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter."  <u>Id.</u>; <u>accord</u> <u>Steger v. Franco, Inc.</u>, 228 F.3d 889,

---

    [10]"The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution . . . [and] . . . to Controversies to which the United States shall be a Party."  U.S. Const. art. III, § 2, cl. 1.

893 (8th Cir. 2000) ("[S]tanding is based on the facts as they existed at the time the lawsuit was filed.").

Van Arnam filed her complaint in this action on May 8, 2000 -- two days before the scheduled date of the rally -- after GSA informed her that refusal to sign the provision would result in denial of the permit application, which is in fact what did occur.[11]  Thus, as of May 8, 2000, Van Arnam was clearly faced with a concrete and particularized injury -- the prohibition of her right to engage in expressive activity -- that was "fairly traceable" to her refusal to sign the challenged Clause.[12]  See Becker, 230 F.3d at 385.

The government relies on Los Angeles v. Lyons, 461 U.S. 95 (1983), to support its contention that Van Arnam lacks standing to seek a declaratory judgment.  That reliance is misplaced.  In

_____

[11]It is irrelevant for standing purposes that Van Arnam controlled whether or not she received a permit for the rally by virtue of signing the Clause.  "[C]learly, one who challenges a governmental action may not be denied standing merely because [her] challenge in a sense stems from [her] own choosing." Becker, 230 F.3d at 388.  Indeed, the purpose of my action on her preliminary injunction motion was to preserve the issues without compromising the interests of the parties, whichever should prevail.

[12]It is also irrelevant for standing purposes that the rally ultimately was not held on federal property, presumably for fear that GSA would have taken action against the protesters if the rally occurred without a valid permit.  See Virginia v. Am. Booksellers Ass'n, 484 U.S. 383, 393 (1988) ("The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise.").  Because the challenged provision was enforced against Van Arnam and Americans to Keep Elian Free, in that GSA denied the permit application, the rally's ultimate location does not affect the standing analysis.

Lyons, the plaintiff alleged that police officers had unconstitutionally applied a chokehold to him, and sought a preliminary injunction significantly curtailing police officers' ability to use chokeholds.  The Court held that a past injury does not ordinarily confer standing to seek declaratory or injunctive relief unless the plaintiff demonstrates a sufficient likelihood that he will again be wronged in a similar way, and therefore the Lyons plaintiff's standing depended upon whether "he is realistically threatened by a repetition of his experience of October, 1976."  461 U.S. at 109; see also Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992) ("because Lyons could not show that an injunction barring future use of the chokehold would provide relief to him, personally, he had no standing to seek that remedy").  The crucial distinction is this: in Lyons, the plaintiff alleged only past injury rather than the imminent threat of future injury.  Lyons is based on "the obvious proposition that a prospective remedy will provide no relief for an injury that is, and likely will remain, entirely in the past." Am. Postal Workers Union, 968 F.2d at 1376.  In contrast, Van Arnam brought the present action before the injury occurred, and -- though it is not necessary for her to establish standing -- the injury has already recurred.

Similarly, when Van Arnam filed her complaint, a favorable decision likely would have redressed the injury.  A judgment holding the Clause unconstitutional would have enabled the rally to proceed as planned and according to terms she sought.  As GSA points out, now that the protest has been held on other property, Americans to Keep Elian Free has disbanded, and Elian has been returned to Cuba, the requested relief will not redress any injury to Van Arnam, who, understandably, has not chosen to seek damages.  The same analysis applies to the later pro-Israel rally.  However, "this subsequent redressibility [sic] problem is one of mootness, not standing." Becker, 230 F.3d at 389; accord Advanced Mgmt. Tech., Inc. v. FAA, 211 F.3d 633, 636 (D.C. Cir. 2000).  I therefore find that Van Arnam -- and, through her, Americans to Keep Elian Free -- has standing to challenge the Clause.

    2. Mootness

In general, a case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Murphy v. Hunt, 455 U.S. 478, 481 (1982) (citations omitted).  Under the mootness doctrine, "'[t]he requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence.'" Arizonans for Official English v. Arizona, 520 U.S. 43, 68 n.22 (1997) (quoting United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980)) (quoting Henry P. Monaghan,

-19-

Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)).  Like standing, the mootness doctrine derives from Article III's requirement that federal courts may decide only actual cases or controversies.  Thus, in order to justify federal jurisdiction, an actual case or controversy must exist at all stages of the proceeding, not just when the action is initiated. Mangual v. Rotger-Sabat, 317 F.3d 45, 60 (1st Cir. 2003). The party invoking the mootness doctrine (here, GSA) "bears a 'heavy' burden in attempting to establish its applicability." Conservation Law Found. v. Evans, 360 F.3d 21, 24 (1st Cir. 2004) (quoting Mangual, 317 F.3d at 61).

Although Van Arnam had standing to bring this action when it was first filed, since then the rally was held, Elian was returned to Cuba, and Americans to Keep Elian Free was disbanded. These facts might appear to suggest that Van Arnam may no longer have a personal stake in the outcome of this action.  However, I find that her challenge is not moot because it falls within the exception for controversies "capable of repetition, yet evading review."  See Me. State Bldg. & Constr. Trades Council v. United States Dep't of Labor, 359 F.3d 14, 18 (1st Cir. 2004).  To come within this exception, a party must show that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is a] reasonable expectation that the same complaining party would be subjected to the same action again."  Id. (quoting Gulf of Me. Fisherman's

Alliance v. Daley, 292 F.3d 84, 89 (1st Cir. 2002)); see also
Lyons, 461 U.S. at 109 (exception applies only where named
plaintiff can make reasonable showing that he will again be
subjected to the alleged illegality).  In essence, the first
prong (inability to litigate challenged action in time)
corresponds to "evading review," and the second prong (reasonable
expectation of recurrence against same complainant) corresponds
to "capable of repetition."

I find that the denial of Van Arnam's demonstration permit
application -- indeed that of almost anyone -- will all but
uniformly present time constraints on the dispute that are "too
short to be fully litigated prior to its cessation or
expiration," Me. State Bldg. & Constr. Trades Council, 359 F.3d
at 18; cf. Bl(a)ck Tea Soc'y v. City of Boston, No. 04-2002, 2004
WL 1700115, *6, ___ F.3d ___, ___ (1st Cir. 2004) (Lipez, J.,
concurring) (noting influence of compressed time schedule in
"determining whether a given time-place-manner restriction is
narrowly tailored to serve a government interest in maintaining
security").  The time between applying for a permit and
conducting a rally regarding a matter of topical interest is
generally short, and in light of the slower pace of litigation,
it is highly likely that the question of the constitutionality of
GSA's Clause will "evade review" before the time for the protest
has passed.  Cf., e.g., Roe v. Wade, 410 U.S. 113, 125 (1973)
(challenge to abortion laws came within exception because

-21-

pregnancy was sure to recur, quite possibly to same plaintiff, yet nine-month gestation period "is so short that the pregnancy will come to term before the usual appellate process is complete"); Becker, 230 F.3d at 389 (challenge to Federal Election Commission debate regulations came within exception because corporate sponsorship of debates was sure to be challenged again in future elections, but short length of campaign season would make timely resolution difficult).

The history of this litigation illustrates the point. Van Arnam applied on May 1, 2000 for a permit to conduct a demonstration on May 10, 2000, and no evidence was submitted suggesting that this was an unusually tardy application. Her permit was denied on May 8, 2000 on the grounds of failure to sign the Clause, and she filed her complaint that same day. Given the realities of litigation, there was virtually no way that she could have received a final resolution on the merits within two days or even two months. Realistically, the only way that Van Arnam could have fully litigated the merits before the planned demonstration date would have been to apply for the permit before Elian Gonzalez ever set sail for Florida. Nor would it have been much use to schedule the demonstration for a full year after Elian's anticipated repatriation. "[T]iming is of the essence in politics . . . . [W]hen an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all." Shuttlesworth v. City of Birmingham, 394

-22-

U.S. 147, 163 (1969) (Harlan, J., concurring).

Van Arnam must also show a reasonable expectation that she will be subjected to the same action again. Before her involvement in Americans to Keep Elian Free, she had never organized any type of rally, nor had she ever applied for permits for any type of rally or demonstration. To the best of her knowledge, she is not a member of any other organization that holds rallies or demonstrations.

However, she did apply for a demonstration permit for a pro-Israel rally to be held at JFK Plaza on April 13, 2002. While there may, in light of the proximity of this application to the scheduled commencement of trial and the lack of any prior interest in activism regarding Israel, be reason to question the depth of her interest in demonstrating on this issue, I see no basis for disregarding her stated (and proven) commitment to continue challenging the Clause by applying for further demonstration permits at JFK Plaza or other GSA facilities. In sum, Van Arnam's past, present, or future commitment to any particular substantive political cause is irrelevant, because she has demonstrated a sufficient likelihood that the Clause will be invoked against her again. It does not matter whether the stated (or ulterior) purpose of the demonstration relates to Elian Gonzalez, Israel, or the Clause itself; she intends to be a test case, and I am satisfied that she will continue to apply for permits (without signing the Clause) as often as necessary to

keep her challenge alive.  No inquiry into the sincerity of her commitment to any particular cause is required or even relevant.

I find there is a "reasonable expectation" that Van Arnam will encounter the same barrier to expressive activity again, and consequently that her claim falls within the "capable of repetition, yet evading review" exception to mootness.

However, I find that Americans to Keep Elian Free is no longer a proper plaintiff.  Because the organization no longer exists, and indeed it was organized to advocate for one specific issue that is not likely to ever recur,[13] there is not "a reasonable expectation that the same complaining party would be subjected to the same action again," Me. State Bldg. & Constr. Trades Council, 359 F.3d at 18; see also Labor Youth League v. Subversive Activities Control Bd., 322 F.2d 364, 370 (D.C. Cir. 1963) (holding that action was moot because organization had dissolved, and noting that "an inchoate possibility of reactivation . . . [cannot] negate a factual dissolution of an unincorporated group").  Therefore, Americans to Keep Elian Free's challenge to the Clause is moot.

## IV. CONSTITUTIONALITY OF INDEMNIFICATION/ HOLD HARMLESS PROVISION

---

[13]If the organization's goal is construed as advocating against the return of any Cuban children to Cuba, then the issue might in theory recur.  However, the fact that the organization disbanded after Elian's return, rather than converting into a standing organization opposing repatriation of Cuban (or other refugee) children, convinces me that it was narrowly focused on Elian Gonzalez.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of people peaceably to assemble, and to petition the Government for a redress of grievances."  U.S. Const. amend. I. Protest speech falls squarely within the protection of the First Amendment's guarantees of freedom of speech and assembly.  <u>See</u> <u>Shuttlesworth</u>, 394 U.S. at 152 (describing privilege of citizens to assemble, parade, and discuss public questions in streets and parks).  However, it is well-settled that the First Amendment does not guarantee unlimited access to government property for expressive purposes.  <u>Int'l Soc'y for Krishna Consciousness, Inc.</u> <u>v. Lee</u>, 505 U.S. 672, 678 (1992) (government "need not permit all forms of speech on property that it owns and controls").  Whether restrictions on access to public property impermissibly infringe on free speech rights depends largely on the nature of the property at issue.  <u>Perry Educ. Ass'n v. Perry Local Educators'</u> <u>Ass'n</u>, 460 U.S. 37, 44 (1983).

**A.    Forum Analysis**

Under the Supreme Court's forum-based approach, public property is classified into three distinct categories: the traditional public forum, the designated public forum, and the non-public forum.  <u>Id.</u> at 45-46.

The traditional public forum is found in places such as "streets and parks which 'have immemorially been held in trust

for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  Id. at 45 (quoting Haque v. CIO, 307 U.S. 496, 515 (1939)).  The state may enforce a content-based restriction on speech in a traditional public forum only if the regulation is "necessary to serve a compelling state interest," and is "narrowly drawn to achieve that end."  Perry, 460 U.S. at 45 (citation omitted).  Content-neutral time, place, and manner restrictions on speech in a traditional public forum are upheld if they are "narrowly tailored to serve a significant government interest" and "leave open ample alternative channels of communications."  Id. (citations omitted).

The designated public forum is public property that would ordinarily not be available for public expressive activity, but which the government has intentionally opened for such use.[14]

_____

[14]Some circuits recognize a sub-category of the designated public forum, known as the "limited public forum," which exists "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." Hotel Employees & Rest. Employees Union, Local 100 v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 545 (2d Cir. 2002) (internal quotation marks omitted); accord Hopper v. City of Pasco, 241 F.3d 1067, 1074-75 (9th Cir. 2001) (limited public forum is "a type of nonpublic forum that the government has intentionally opened to certain groups or to certain topics"), cert. denied, 534 U.S. 951 (2001).  The Supreme Court and the First Circuit seem to use the terms "designated public forum" and "limited public forum" interchangeably.  E.g., New Eng. Reg'l Council of Carpenters v. Kinton, 284 F.3d 9, 20 (1st Cir. 2002) (referring to "a designated public forum (sometimes called a limited public forum)").

Id. at 45; Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.,
473 U.S. 788, 802 (1985). Although a state need not indefinitely
retain the open character of a designated public forum, "as long
as it does so it is bound by the same standards that apply in a
traditional public forum." Perry, 460 U.S. at 46. Designated
public fora generally do not closely resemble traditional public
fora, but are rather entirely different spaces that the
government has, for the purpose of facilitating speech, opened to
public use. See, e.g., Grace Bible Fellowship, Inc. v. Me. Sch.
Admin. Dist. No. 5, 941 F.2d 45, 48 (1st Cir. 1991) (school
building opened for public use during non-school hours); Aids
Action Comm. v. Mass. Bay Transp. Auth., 849 F. Supp. 79, 82 (D.
Mass. 1993) (Zobel, J.) (advertising space in transit system),
aff'd on other grounds, 42 F.3d 1 (1st Cir. 1994).

A non-public forum is any public property not open by
tradition or explicit designation to the public for expressive
activities; it consequently is governed by different standards
for evaluating restrictions on expression. Perry, 460 U.S. at
46. Both content-neutral time, place, and manner restrictions
and "reasonable" content-based restrictions are permissible in
non-public fora, so long as the restrictions are "not an effort
to suppress expression merely because public officials oppose the
speaker's view." Id. Because the non-public forum is the
"default" status of government property, physical spaces with
this status vary widely. See, e.g., Lee, 505 U.S. at 679-80

-27-

(airport terminal); <u>United States v. Kokinda</u>, 497 U.S. 720, 727
(1990) (sidewalk connecting post office with its parking lot).

The government does not concede that the federal property
surrounding the JFK Building is either a traditional or a
designated public forum.[15]  GSA contends that JFK Plaza is not
"commonly used" for protests or rallies and that its principal
purpose is for entrance and egress from the building.  Relying on
<u>Cornelius</u>, 473 U.S. at 804 ("where the principal function of the
property would be disrupted by expressive activity, the Court is
particularly reluctant to hold that the government intended to
designate a public forum"), the government contends that, because
the small area of federal property on the Cambridge Street side
of the JFK Building is a means of entrance and exit for the 3,500
people who come through the Cambridge Street doorway each day,
the necessity of controlling the number of people in such a
relatively small space weighs against finding the property to be
a public forum.

I do not find these arguments particularly compelling on
this record.  JFK Plaza is generally open for public use, and has

---

[15]Indeed, the government, citing <u>Kokinda</u>, seems to contend
that GSA is subject to a lower level of First Amendment scrutiny
simply because it functions as a proprietor that manages
government properties.  However, the Court in <u>Kokinda</u> recognized
that the fact that the government is acting as proprietor of
public property does not determine the level of scrutiny to be
applied.  <u>See</u> 497 U.S. at 725-26.  Instead, when the government
is managing property, the tripartite forum analysis announced in
<u>Perry</u> applies, and thus the level of scrutiny is based on the
nature of the forum.

a history of use for rallies and other expressive activity; the
fact that GSA requires a permit to use the property does not make
it a non-public forum.  Geographically, the plaza -- which is not
obviously distinct from the adjacent City Hall Plaza -- is much
more like the sidewalk in front of the Supreme Court than the
sidewalk in front of the Bowie, Maryland post office.  Compare
United States v. Grace, 461 U.S. 171, 179-80 (1983) (holding that
Supreme Court sidewalk is a public forum, and emphasizing that it
is coextensive with regular city sidewalks, not separated or
fenced to indicate to "persons stepping from the street to the
curb and sidewalks . . . that they have entered some special type
of enclave") with Kokinda, 497 U.S. at 723 (holding that sidewalk
connecting Bowie, Md. post office with its parking lot is a non-
public forum, and emphasizing that it was not connected to public
sidewalk and served no use other than entrance and egress between
post office and its parking lot).

Finally, the track record of public (even if infrequent) use
for expressive activity, without any limitations on who may use
it or for what purposes, marks it as a traditional public forum.
Indeed, it even shares some of the attributes of a street in that
it is "continually open, often uncongested, and . . . not only a
necessary conduit in the daily affairs of a locality's citizens,
but also a place where people may enjoy the open air or the
company of friends and neighbors in a relaxed environment."
Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S.

640, 651 (1981).

I therefore conclude that JFK Plaza is a traditional public forum.  I now turn to the question whether the Clause is a valid time, place, or manner regulation in accordance with the Perry standards for restrictions on speech in a public forum.

## B.   Fees and Potential Financial Responsibility as a Prior Restraint

The Supreme Court held some time ago that a state may require, as a condition to engaging in expressive activity, that a permit applicant pay fees to defray government costs directly attributable to the speech activity.  Cox v. New Hampshire, 312 U.S. 569 (1941).  The Cox Court upheld a fee that ranged from "$300 to a nominal amount" and that was intended "to meet the expense incident to the administration of the [licensing] act and to the maintenance of public order in the matter licensed."  312 U.S. at 576-77.  However, courts have since refined the general rule announced in Cox, subjecting mandatory license and fee requirements to closer constitutional analysis.

In Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992), the Supreme Court addressed the constitutionality of charging a fee for use of a public forum.  The Court noted that a government ordinance requiring a permit and a fee as a precondition to authorizing speaking, parades, or assemblies in a public forum is formally a prior restraint on speech.  Id.; see also Niemotko v. Maryland, 340 U.S. 268, 271 (1951) (collecting

cases holding that permit requirements are prior restraints).
There is a "heavy presumption" against the validity of a prior
restraint on speech.  <u>Forsyth County</u>, 505 U.S. at 130.

Notwithstanding this presumption, the Court recognized that
permit and fee requirements may be imposed by the government in
order to regulate competing uses of public forums.  <u>Id.</u>  As the
First Circuit recently observed, "[t]he Supreme Court has
explicitly rejected attempts to analyze security-based
time-place-manner restrictions as prior restraints."  <u>Bl(a)ck Tea
Soc'y</u>, 2004 WL 1700115, at *3, __ F.3d at __ (citations omitted);
<u>see also</u> <u>Thomas v. Chicago Park Dist.</u>, 227 F.3d 921, 923 (7th
Cir. 2000) (noting "heterogeneity of the practices that the
'prior restraints' formula covers" and expressing "doubt that it
can provide much assistance to judges who have to decide a novel
case."), <u>aff'd</u>, 534 U.S. 316 (2002).  Rather, a permit scheme
regulating the time, place, and manner of speech is permissible,
so long as it (1) does not "delegate overly broad licensing
discretion to a government official," (2) is content-neutral, (3)
is narrowly tailored to serve a significant governmental
interest, and (4) leaves open ample alternatives for
communication.  <u>Id.</u>; <u>New Eng. Reg'l Council of Carpenters v.
Kinton</u>, 284 F.3d 9, 20 (1st Cir. 2002).  Because these
requirements are framed conjunctively, all four must be
satisfied, and failure to satisfy even one renders the permit

scheme invalid.

The <u>Forsyth County</u> Court considered a facial challenge to a county ordinance that required permits for private demonstrations and other uses of public property and imposed a fee of up to $1,000 to meet the expense of the ordinance's administration and the maintenance of public order.  505 U.S. at 123.  The Supreme Court found the ordinance to be unconstitutional because it granted unfettered discretion to the county administrator charged with setting the permit fee, and because the ordinance, by taking into consideration costs "associated with the public's reaction to" the expressive activity, arguably based the fee in part on the content of the speech.  <u>Id</u>. at 132-34.

<u>Forsyth County</u> was concerned with fees that are paid directly to the government as a prior condition to obtaining a permit to use public land.  Here, because the financial obligation of the Clause is indirect and open ended, a more nuanced analysis is necessary.

In pursuing that analysis, I find instructive lower court decisions that have applied the relevant principles to evaluate the constitutionality of requiring a permittee to obtain private liability insurance as a condition of using the forum.  Such a requirement poses the same impediment to speech as a prior permit fee because it effectively requires the permit applicant to pay a sum -- the insurance premium -- as a prerequisite to using the forum for First Amendment activities.  By reducing the open ended

quality of the risk of indemnification at issue here to the present value of the premium, the actual impact of potential financial responsibility on the exercise of expression can be more readily evaluated.[16]  I recognize, of course, that liability insurance functions differently from permit fees in several key respects.  I will address these considerations below as they affect the various Forsyth County factors.

The lower courts have generally found mandatory insurance provisions to be unconstitutional prior restraints on speech under various prongs of the Forsyth County test.  See, e.g., E. Conn. Citizens Action Group, 723 F.2d 1050, 1057 (2d Cir. 1983) (invalidating state transportation department's $750,000

---

[16]I note that at least one court has taken the position that unlike fees paid to the government to reimburse costs actually incurred as a result of the permittee's activities, fees paid to a third-party insurer are not directly related to the administrative expenses incurred by the speech activity, but are for contingencies that may never occur.  See Long Beach Lesbian & Gay Pride, Inc. v. City of Long Beach, 17 Cal. Rptr. 2d 861, 876 (Cal. Ct. App. 1993).  That analysis seems simplistic.  An insurance premium is simply a liquidated figure to cover the government's potential risk.  That risk is by definition contingent because the premium reflects the anticipated cost of the risk and is therefore an ex ante estimate of the actual extent of damage or liability.  The administrative costs presumably find their rough equivalent in costs that the government, if it were a self-insurer, would incur in a more diffuse way than a private insurer.  The fact that a premium is paid to a third party rather than directly to GSA seems largely irrelevant for First Amendment purposes, except insofar as private insurers can and do continue to base event liability premiums on factors that the government may not lawfully consider.

liability insurance requirement for political march);[17] Collin v. Smith, 578 F.2d 1197, 1208-09 (7th Cir. 1978) (the Nazi/Skokie case) ($300,000 liability insurance requirement was conceded to be unconstitutional as applied to group that could not afford it), cert. denied, 439 U.S. 916 (1978); Wilson ex rel. United States Nationalist Party v. Castle, No. 93-3002, 1993 WL 276959, *4 (E.D. Pa. July 15, 1993) (invalidating insurance requirement, at least as applied to those who could not afford premium, because it was not sufficiently narrowly tailored to governmental interests in protecting public property and averting liability for injuries, at least as applied to those who could not afford it); Invisible Empire of the KKK v. Mayor of Thurmont, 700 F. Supp. 281, 285 (D. Md. 1988) (invalidating insurance and indemnification requirements because town could not show requirements were necessary, and it could more narrowly serve its safety interests by arresting violators of its criminal laws); Houston Peace Coalition v. Houston City Council, 310 F. Supp.

---

[17]The Second Circuit in Eastern Connecticut Citizens Action Group found the insurance requirement did not represent the least restrictive means of serving the state's interest in avoiding losses resulting from the plaintiff's activities.  723 F.2d at 1055-56.  It is important to note, however, that the "least restrictive means" analysis then employed by the Second Circuit was later rejected by the Supreme Court.  Ward v. Rock Against Racism, 491 U.S. 781, 798 (1989) ("Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so.").

457, 461-63 (S.D. Tex. 1970) (invalidating a liability insurance requirement that gave unlimited discretion to city official to set amount of insurance required); see also Plain Dealer Publ'g Co. v. City of Lakewood, 794 F.2d 1139, 1146-47 (6th Cir. 1986) (invalidating insurance and indemnification requirements governing newsracks on public streets, because non-newsrack permittees such as bus and telephone companies were not subject to those requirements), aff'd in part on other grounds, 486 U.S. 750 (1988) (4-3 decision).

The indemnification/hold harmless provision at issue here is technically not the same as an insurance requirement, because a permittee can make her own determination whether to obtain third party insurance or face the risk of liability as a self-insurer. However, it is not unreasonable to expect that one faced with unlimited liability as a consequence of the Clause would choose to purchase liability insurance to cover that risk.  See Eric Neisser, Charging for Free Speech: User Fees and Insurance in the Marketplace of Ideas, 74 Geo. L.J. 257, 270-71 (1985); David Goldberger, A Reconsideration of Cox v. New Hampshire: Can Demonstrators Be Required to Pay the Costs of Using America's Public Forums?, 62 Tex. L. Rev. 403, 451 n.196 (1983) (indemnification requirements "are merely substitutes for insurance policies and should be analyzed in the same way that insurance requirements are analyzed").  In fact, a principal purpose of insurance is to reduce one's risk of liability by

spreading the cost among a large number of insureds, only a small number of whom will actually suffer a loss.

Whether a rational person would choose to purchase private insurance or to self-insure probably depends mainly on three factors: (1) the ability of the organizer and her organization to obtain the insurance (i.e., that it is offered to the group, and that they can afford it); (2) the organizer's ability to bear the maximum loss personally; and (3) the organizer's immunity from any judgment.[18]  Key factors that would enter into any rational evaluation of this decision -- how controversial the event and its sponsors will be; whether it will elicit a counterdemonstration, and if so, how large and how belligerent -- are nearly identical to the factors an insurer would use in setting a premium.

I conclude that, while the Clause does not technically compel event insurance, the realities require all but the judgment-proof and the foolhardy to give very serious consideration to purchasing private insurance.  Furthermore, both the maximum likely loss and the premium will tend to increase as the subject matter of the event becomes more controversial,

---

[18]Note that the last two factors are in tension: self-insurance could be more attractive to the very wealthy (who can bear the maximum likely loss) and the poor (from whom a judgment for that loss cannot be collected) than the middle class, who may have enough income and assets to be at risk of significant personal exposure to a judgment, yet would be financially ruined by one if it were entered, let alone executed upon.

meaning that most people organizing an even mildly controversial event would be reckless not to purchase insurance, if it is available to them.

I now turn to each of the four factors identified by <u>Forsyth County</u> and evaluate the constitutionality of the Clause.  For simplicity of exposition, I consider them in a slightly different order, addressing first the two factors that I find plainly not constitutionally problematic, and then turning to the two that present more difficult constitutional questions.

> 1.    <u>Administrative Discretion</u>

Permit fees and insurance requirements have been struck down due to lack of specificity in the standards prescribed for the insurance and the degree of discretion afforded to city officials.  See <u>Forsyth County</u>, 505 U.S. at 131-33 (invalidating permit fee requirement because of the unbridled discretion granted to the county administrator); <u>Houston Peace Coalition</u>, 310 F. Supp. at 461-62 (invalidating insurance requirement where the city attorney effectively exercised uncontrolled discretion to grant or deny a parade permit by setting the amount and type of liability insurance required).  To survive judicial scrutiny, an insurance requirement imposed upon permit applicants must set forth "clear, non-discriminatory and non-discretionary requirements concerning such liability insurance," and be administered in a "non-discriminatory and non-discretionary basis."  <u>Houston Peace Coalition</u>, 310 F. Supp. at 462-63;

<u>Invisible Empire Knights of the KKK v. City of West Haven</u>, 600 F.
Supp. 1427, 1432-33 (D. Conn. 1985) (finding bond requirement
unconstitutional due, in part, to lack of adequate standards for
determining amount of bond required).

GSA does not set forth any specific insurance policy
minimum, because it does not require insurance at all.  Instead,
the Clause makes the permittee responsible for "any and all loss,
damage, claim, or liability" suffered by the United States as a
result of the use of the forum.  While the level of liability is
potentially unlimited, the level of insurance coverage (if any)
is left to the discretion of the individual applicant and the
business decisions of insurers.  In any event, I do not find that
the provision in any way grants excessive discretion to a
government administrator.

2.    <u>Alternatives for Communication</u>

GSA argues that the Clause does not foreclose a channel of
communication, because it only requires that "someone wishing to
use federal property as one place to communicate be ready to pay
for any damage that results from that activity."  However, if the
challenged provision results in a potential permittee declining
to apply for fear of overbroad personal liability, as arguably
occurred in the present action, it does foreclose a venue for
communication that would otherwise be available.

A better argument would be that, on the facts of this
record, the adjacent City Hall Plaza provides an adequate
alternative for communication.  In fact, Van Arnam's rally did
occur as scheduled on May 10, 2000, on the section of City Hall
Plaza adjacent to the JFK Building, and well within sight of it.

However, Van Arnam argues that she is entitled to protest
federal action on federal property designated as a public forum.
It is true that the location of a demonstration may be "an
essential part of the message sought to be conveyed," as well as
"essential to communicating with the intended audience."
<u>Nationalist Movement v. City of Boston</u>, 12 F. Supp. 2d 182, 192
(D. Mass. 1998) (O'Toole, J.); <u>see also</u> <u>Schneider v. New Jersey</u>,
308 U.S. 147, 163 (1939) ("one is not to have the exercise of his
liberty of expression in appropriate places abridged on the plea
that it may be exercised in some other place").

Based on the factual record, I conclude that, while City

Hall Plaza is not precisely <u>equal</u> to JFK Plaza as a site for expressive activity directed at the federal government in Boston, it is an "adequate" alternative.  Because city property is physically adequate, and because the city does not burden the exercise of First Amendment rights with onerous licensing requirements involving acceptance of open-ended financial responsibility, I conclude that the Clause did not foreclose adequate alternative channels of communication for the message to be conveyed to its intended audience.

      3.  <u>Content-Neutrality</u>

Regulations which permit the government to discriminate in public forum on the basis of the content of the expression are suspect.  <u>Forsyth County</u>, 505 U.S. at 135.  However, time, place, and manner regulations receive only intermediate scrutiny:

> Such laws are less threatening to freedom of speech
> because they tend to burden speech only incidentally,
> that is, for reasons unrelated to the speech's content
> or the speaker's viewpoint.  Where that description
> applies, courts employ a less exacting level of
> scrutiny, upholding limitations on the time, place, and
> manner of protected expression as long as "they are
> justified without reference to the content of the
> regulated speech, . . . are narrowly tailored to serve
> a significant governmental interest, and . . . leave
> open ample alternative channels for communication of
> the information."

<u>McGuire v. Reilly</u>, 260 F.3d 36, 43 (1st Cir. 2001) (quoting <u>Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 293 (1984)). Indeed, "[i]f content-neutral prohibitions on speech at certain places were deemed prior restraints, the intermediate standard of

review prescribed in the time-place-manner jurisprudence would be eviscerated."  Bl(a)ck Tea Soc'y, 2004 WL 1700115, at *3, __ F.3d at __.

A statute may be deemed content-neutral even though it has an incidental effect on some speakers and not others, so long as the reason for the differential treatment is not content-based. See McGuire, 260 F.3d at 44 ("The critical question in determining content neutrality is not whether certain speakers are disproportionately burdened, but, rather, whether the reason for the differential treatment is -- or is not -- content-based."); see also Hill, 530 U.S. at 719 (a statute is content-neutral if it does not directly regulate speech, has its origins in a legislative purpose unrelated to disagreement with the underlying message of particular speech, and advances interests unconnected to expressive content).

At the outset, it is important to emphasize that the Clause itself is facially content-neutral in its terms, and Van Arnam does not allege that it was designed to deliberately disfavor certain speech or speakers.[19]   The Clause does not directly

_____

[19]This lack of content-discriminatory motive or enforcement distinguishes it somewhat from Collin, where there was evidence that the Village of Skokie's enforcement of the insurance requirement varied depending on the group involved, through "co-sponsorship" or discretionary waivers.  See 578 F.2d at 1208 & n.20.  In essence, the insurance requirement disfavored all speech, and Skokie "rescued" certain speech by various devices. This background may explain the Seventh Circuit's conclusion that the insurance requirement was not facially neutral:

restrict either a particular viewpoint or any subject matter that
may be discussed by a speaker.  It does not draw distinctions
based on the subject matter of the proposed gathering, but rather
applies equally to all persons and organizations seeking a permit
regardless of viewpoint.  The language of the provision makes no
reference to the content of the message.  GSA apparently uses the
same permit application across the United States, and
consistently requires all persons seeking a permit to sign the
Clause.  GSA's interests in protecting the access of employees
and the public to the JFK Building, and maintaining against wear
and tear in the spaces it manages, are unrelated to the
underlying content of the regulated speech.  For these reasons, I
find that the Clause does not <u>facially</u> violate the First
Amendment.

However, the provision raises the prospect that, when
implemented in the real world, third-party insurers will
inevitably make content-based fee determinations.  Although GSA
does not require permit applicants to obtain liability insurance,

----

It is true that the [insurance] requirement does not
turn on the content of a proposed demonstration, except
in the sense that controversial groups will likely be
unable to obtain insurance, as here. (That several less
controversial groups were able to do so, of course,
proves nothing.)  But it is most assuredly not facially
neutral towards First Amendment activity, which is what
[<u>United States v. O'Brien</u>, 391 U.S. 367 (1968)]
requires.

578 F.2d at 1209.

the likely consequence of such a broad Clause is that permittees
will seek such coverage to manage uncertain personal liability.
Based on the evidence of insurance practices in this case, I have
concluded that a private insurer would apply content-, speaker-,
and viewpoint-based criteria in determining whether to offer
event liability insurance and, if so, how much to charge.  Many
other courts have reached the same conclusion.  See, e.g., E.
Conn. Citizens Action Group, 723 F.2d at 1056 n.2 (insurance
companies often consider factors such as political beliefs, the
likelihood of adverse publicity to the insurance company, and the
organization's lack of business experience in deciding whether to
accept or reject applications for insurance coverage); Collin,
578 F.2d at 1208-09 (Nazi plaintiffs proved, by expert testimony,
that private insurers would generally refuse to insure their
events); Wilson, 1993 WL 276959, at *3 ("Many of the twenty
insurers contacted by [the Nationalist Party] would not do
business with the Party at any price."); Mayor of Thurmont, 700
F. Supp. at 284 ("It has been stipulated by the parties that
while there is a market for parade insurance in Maryland, the
insurance industry will not sell insurance to the KKK due to its
perceived reputation and perceived fear of disturbance . . . .").

Furthermore, the special event insurance underwriting business contains a built-in bias against new speakers:

> [U]nderwriters generally refuse to write insurance, or else charge the highest applicable rate, to newcomers for whom there is not enough information to make a proper determination under the company's rate classifications or underwriting criteria.  This is especially true when time pressures preclude extensive investigation.  Underwriters may also require complete advance payment of the premium by a new insured, rather than the typical payment over time.  Finally, experience with special event insurance shows that when the insurance is unusual, the paperwork significant, and the profit small, underwriters will refuse to write insurance to strangers, but will accommodate established customers.

Neisser, 74 Geo. L.J. at 276.  The foregoing considerations generally persuade me that an indemnification clause that effectively requires the purchase of private liability insurance imports criteria that cannot be justified without reference to the content, viewpoint, or speaker.

To be sure, some courts have found otherwise.  In <u>Thomas v. Chicago Park District</u>, the Seventh Circuit concluded that a requirement of a one million dollar insurance policy did not involve content-based criteria:

> [T]he amount of insurance required [was] not . . . influenced by[] the nature of the event, and specifically by whether it involves controversial expressive activity likely to incite violence by onlookers or opponents.  The required amount and the cost of the insurance depend only on the size of the event and the nature of the facilities involved in it (a bandstand, stage, tents, and so forth).

227 F.3d at 925.[20]  The Seventh Circuit's view of that case may

have been colored by its impression that "[t]he required amount

and the cost of the insurance depend only on" content-neutral

factors.  See id. at 925 (emphasis added).  The latter

proposition, even if true in that case, is not true on the facts

I have found on this record.

Similarly, the Ninth Circuit found no First Amendment

violation where a park required potential bandstand users to post

a bond for liability insurance to cover equipment damage or

liability resulting from the event's "unanticipated effects" on

park visitors:

> The bond requirement is content-neutral in that it is
> applied to every applicant regardless of the nature of
> the expression or content of the message they wish to
> convey.  It furthers a significant government interest:
> the protection and maintenance of an expensive sound
> system.  It is narrowly tailored to meet that goal by
> requiring most applicants to post the bond.

Gerritsen v. City of Los Angeles, 994 F.2d 570, 578-79 (9th Cir.

1993), cert. denied, 510 U.S. 915 (1993).  The Ninth Circuit did

not explain whether the bond was set at a fixed amount for all

users, or whether insurers could (and did) charge different

amounts for each user.

With due respect to the Seventh and Ninth Circuits, the

analyses in Thomas and Gerritsen fail to address a key issue

---

[20]I note that, while the Supreme Court affirmed Thomas, see
534 U.S. 316 (2002), the petition for certiorari did not raise
the insurance requirement, and the question was not therefore
before the Court.  See Pet. for Writ of Cert., Thomas v. Chicago
Park Dist., 2001 WL 34091941, at *i (Feb. 1, 2001).

here: the fact that liability premiums are higher for more
controversial speakers.  The record here indicates that private
insurers -- quite rationally, from an actuarial point of view --
set premiums for event liability insurance based largely on
speaker-, content-, and viewpoint-based factors.  Put simply,
controversial speech will be especially burdened, or even
deterred completely, by an indemnity clause that <u>de facto</u>
requires private event insurance.[21]

The organizer who decides not to purchase insurance faces
the same set of burdens.  She must make the same analysis of
probability and magnitude of violence or damage as an insurer
would, only without the benefit of a trained actuary (albeit with
the possible benefit of knowing more about the causes's
sympathizers and opponents).  Put another way, the rational self-
insuring event organizer (if, other than the extremely wealthy or
judgment-proof, there really is such a person) would set aside in
advance at least as much as the market-rate private insurance
premium -- a figure determined from content-based criteria.[22]
For instance, an organization styled as Grandmothers Knitting
Mittens will inevitably have little risk of attracting violent
hecklers.  For such a group, the theoretical unlimited liability

---

[21]Even if the organizer can afford the premium,
controversial speech is still burdened more than non-
controversial speech.

[22]Probably much more, because she cannot spread the risk
across other event organizers, let alone other types of risk.

imposed by the Clause, when multiplied by the probability of any damage that would lead GSA to invoke the Clause, may approach zero.  On the other hand, a group promoting or opposing gay marriage, or racially-based busing of schoolchildren, might realistically expect hecklers to commit a certain amount of violence or property damage.  Faced with the prospect of financial liability for what its opponents do, the group might decide to "tone down" the message, or not speak at all.[23]  In sum, those who, for whatever reason, cannot or do not purchase insurance will still be differentially deterred -- because of financial obligations imposed by the government -- from speaking on the topics or in the manner desired (or at all) based on the content or viewpoint of their speech.

Having said all that, the question remains whether a facially content-neutral regulation becomes content-based because it indirectly imports from the insurance industry (or effectively imposes directly upon self-insuring speakers) a differential burden on speech that correlates precisely to its likely

---

[23]It is irrelevant that Van Arnam's rally did not (and probably was not expected to) attract violent reaction, and that her cause and organization did not attract the level of vitriol and venom that would be directed at widely despised groups such as Nazis or the Ku Klux Klan.  Though the case could have been more sharply presented by a more controversial group (for instance, one that was literally unable to obtain insurance at any price), Van Arnam has standing to raise her claim that she was deterred from speaking on federal property by a requirement that, though formally content-neutral, indirectly imports the content-based criteria of insurers and, indeed, hecklers.

communicative impact.  It is well-established that a regulation
that <u>directly</u> regulates or burdens speech based on communicative
impact is subject to strict scrutiny, and bears a presumption of
invalidity.  <u>See, e.g.</u>, <u>United States v. Eichman</u>, 496 U.S. 310,
317-18 (1990) (invalidating federal flag-burning statute that
enumerated several prohibited ways to damage a flag, because all
were based on "likely communicative impact"); <u>Texas v. Johnson</u>,
491 U.S. 397, 400, 411-12 (1989) (invalidating Texas flag-burning
statute that prohibited damaging a venerated object if it would
"seriously offend one or more persons").

     However, the cases suggest that a facially content-neutral
regulation that (undisputedly) had no ulterior content-based
purpose cannot be deemed constructively content-based on the
basis of its effects.  The Supreme Court has stated that a court
must determine whether a regulation is content-based or content-
neutral by "look[ing] to the purpose behind the regulation."
<u>Bartnicki v. Vopper</u>, 532 U.S. 514, 526 (2001).  The regulation is
deemed content-neutral "so long as it is 'justified without
reference to the content of the regulated speech.'" <u>Id.</u> (quoting
<u>Ward</u>, 491 U.S. at 791).  The government's purpose is the
touchstone:

          The principal inquiry in determining content
          neutrality, in speech cases generally and in time,
          place, or manner cases in particular, is whether the
          government has adopted a regulation of speech because
          of disagreement with the message it conveys.  The
          government's purpose is the controlling consideration.
          A regulation that serves purposes unrelated to the

> content of expression is deemed neutral, even if it has
> an incidental effect on some speakers or messages but
> not others.

Ward, 491 U.S. at 791.  Of course, a censorial motive is not

essential to demonstrating that a regulation is content-based;

"'[i]llicit legislative intent is not the sine qua non of a

violation of the First Amendment.'"  Simon & Schuster, Inc. v.

Members of N.Y. State Crime Victims Bd., 502 U.S. 105, 117 (1991)

(alteration in original) (quoting Minneapolis Star & Tribune Co.

v. Minn. Comm'r of Revenue, 460 U.S. 575, 592 (1983)).  However,

a facially content-neutral regulation is not deemed to be

content-based without evidence that the government intended, even

with the best of motives, to treat some speech differently from

others based (even indirectly) on the content.

In short, under current jurisprudence, "there is no

disparate impact theory under the First Amendment."  Norton v.

Ashcroft, 298 F.3d 547, 553 (6th Cir. 2002), cert. denied, 537

U.S. 1172 (2003); United States v. Dinwiddie, 76 F.3d 913, 923

(8th Cir. 1996) (en banc) (same), cert. denied, 519 U.S. 1043

(1996); but see Johnson, 491 U.S. at 439 n.* (Stevens, J.,

dissenting) (characterizing majority opinion as the "introduction

of disparate-impact analysis into our First Amendment

jurisprudence").  The fact that a facially content-neutral

regulation affects speakers professing a certain viewpoint more

than others "does not 'itself render the [statute] content or

viewpoint based.'"  Dinwiddie, 76 F.3d at 923 (alteration in

-49-

original) (quoting <u>Madsen v. Women's Health Center, Inc.</u>, 512

U.S. 753, 763-64 (1994)); <u>cf.</u> <u>Heffron</u>, 452 U.S. at 649 n.12

(rejecting argument that state fair rule prohibiting distribution

of material except from fixed booths was "not content-neutral in

that it prefers listener-initiated exchanges to those originating

with the speaker" as "interesting but [of] little force" because

rule applied equally to all exhibitors).[24]

I therefore conclude that, even though the Clause (as

implemented in the real world) imposes disparate costs on speech

based on the content of that speech, its facial content-

neutrality and the lack of proof of any content-discriminatory

intent make it, for First Amendment purposes, content-neutral.

    4.  <u>Narrow Tailoring</u>

To survive under public forum analysis, a time, place, and

manner regulation must be "narrowly tailored to serve a

significant government interest."  <u>Perry</u>, 460 U.S. at 45.  A

regulation is "narrowly tailored if it targets and eliminates no

---

[24]Much scholarly criticism has been leveled at this approach
to content-neutral regulations that have disparate content-based
effects.  Professor Sullivan has compared the "conventional view"
that "[n]ot everyone [affected by such regulations] has equal
speaking opportunities, but . . . that is not the fault of the
state" to Anatole France's quip that "'[t]he law in its majestic
equality, forbids the rich as well as the poor to sleep under
bridges.'"  Kathleen M. Sullivan, <u>Free Speech Wars</u>, 48 SMU L.
Rev. 203, 208-09 (1994) (quoting Anatole France, <u>Le Lys Rouge</u> 91
(1894)); <u>see also</u> Susan H. Williams, <u>Content Discrimination and
the First Amendment</u>, 139 U. Pa. L. Rev. 615, 674-75 (1991)
(arguing that the principles motivating disparate impact analysis
under Equal Protection Clause also apply to speech).

more than the exact source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485 (1988) (quoting City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808 (1984)).

The narrow tailoring requirement is satisfied where the regulation promotes "a substantial government interest that would be achieved less effectively absent the regulation" but does not "burden substantially more speech than is necessary to further the government's legitimate interests." Ward, 491 U.S. at 799. The regulation need not be the least restrictive means of serving the government interest; it simply must be "not substantially broader than necessary to achieve the government's interest." Id. In short, the "essence of narrow tailoring" is that the regulation must "focus[] on the source of the evils the [government] seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Id. at 800 n.7. In this connection, it bears emphasizing that "the validity of time, place, or manner regulations is not subject to 'a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.'" Bl(a)ck Tea Soc'y, 2004 WL 1700115, at *3, ___ F.3d at ___ (quoting Ward, 491 U.S. at 800) (internal quotation marks omitted).

Before delving further, I pause to analyze precisely what the Clause does (and does not) do.  One useful way to understand its legal effect is to analyze what it adds to GSA's legal rights as compared to the default (no Clause) position.  Even without the Clause, there is little doubt that, under ordinary tort principles, GSA could successfully hold the event organizer and her organization directly liable for damage or injuries that they themselves perpetrated.  The Clause appears to change GSA's legal rights in two principal ways.  First -- although this is not a source of constitutional concern in this case -- it converts common law tort liability into contractual liability, with somewhat more certainty and a different procedural flavor.[25] Second, of greater concern, it holds the event organizer liable for injuries or damage caused by third parties, whether they be curious onlookers or violent hecklers.

I now turn to whether the Clause is narrowly tailored to serve a significant government interest.  I begin with the government interests that GSA asserts the Clause is designed to serve.  GSA's stated purposes for the Clause are to ensure that employees and visitors to the JFK Building are not exposed to unnecessary risks in their access to the building, to protect public property by holding those who use it financially responsible for damage, and to shield the government from

---

[25]For instance, there might be different statutes of limitations for actions in contract versus actions in tort.

liability.  After analyzing each of these stated purposes, I turn
to the separate problem of whether the Clause is not narrowly
tailored because of its disparate impact on the indigent.

i.  Access to Building

GSA notes that the plaza surrounding the JFK Building is
relatively small.  The JFK Building has only two public
entrances.  The Cambridge Street entrance is accessed only by
crossing the property, and people enter and exit the building
through that entrance approximately 3,500 times per day.  The
government's interest in ensuring public safety and order and
promoting the free flow of traffic on streets, sidewalks, and
plazas constitutes a significant interest.  See, e.g., Schenck v.
Pro-Choice Network of W.N.Y., 519 U.S. 357, 376 (1997)
(recognizing the significance of "ensuring public safety and
order, promoting the free flow of traffic on streets and
sidewalks, [and] protecting property rights").  The government's
interest in facilitating building access plainly implicates
public safety.  See id.  GSA contends, and I agree, that ensuring
the safety and security of federal buildings, and more
specifically maintaining safe access to building entrances at all
times, is a significant governmental interest.  Cf. United for
Peace & Justice v. City of New York, 243 F. Supp. 2d 19, 24-25
(S.D.N.Y. 2003) (ensuring safe access to United Nations
headquarters and United States Mission was significant government
interest), aff'd, 323 F.3d 175 (2d Cir. 2003) (per curiam).

However, the contested provision does not particularly further GSA's stated interest either in protecting employees and visitors or in maintaining access to the JFK Building.  The Clause does not make it any more or less likely that demonstrators will block the entrance to the building.[26]  In fact, the permit already contains a reasonably effective method for ensuring access: most of the permits that GSA issues for public use of JFK Plaza include very specific "special conditions" restricting the events to specified portions of the plaza and/or expressly requiring that the entrance not be blocked.  See supra p. 8.  If demonstrators violate those conditions, GSA could revoke the event license and engage the Federal Protective Service to remove them from the premises or even arrest them.  I am not persuaded, however, that demonstrators will be further motivated not to block the building by the prospect that (1) someone might sue the government for failing to ensure proper access to the building, (2) that plaintiff would actually succeed in obtaining damages, and (3)

---

[26]If, however, the contention is that by forcing permittees to bear the costs of their activities, the indemnity provision will deter some groups from using JFK Plaza for any protests (and thereby preserve access to the building), then the goal is in plain conflict with the First Amendment obligations of those who manage public forums and is not a permissible government interest.  Cf. Bullock v. Carter, 405 U.S. 134, 145-46 (1972) (invalidating filing fee of almost $9,000 designed "to limit the ballot to the more serious candidates"); E. Conn. Citizens Action Group, 723 F.2d at 1056 ("exercise of constitutional rights may not be conditioned upon financial requirements for the purpose of deterring frivolous requests").

GSA would then seek contractual indemnity from the event
organizer.  Of course, hecklers, spectators, and unaffiliated
sympathy demonstrators would not be deterred by the Clause at
all.

Nor does the provision significantly reduce the risk of harm
to employees and visitors.  Although the prospect that the
permittee, the sponsoring organization, and their agents could be
held liable for harm to such individuals during the course of a
demonstration might be a deterrent that would perhaps cause them
to be more cautious in their actions, the same cannot be said for
third parties.

I conclude that GSA's access interests would be achieved no
less effectively without the Clause, and that, to the degree this
is presented as justification for the Clause, it restricts
"substantially more speech than is necessary," Ward, 491 U.S. at
799.

### ii. Protecting Public Property

GSA justifies the indemnification requirement as furthering
its interest in protecting public property.  But while GSA may
have a right to compensation for certain expenses directly
attributable to the activities of a rally, a requirement that the
permittee indemnify GSA "against any and all loss, damage, claim
or liability whatsoever" is not tailored narrowly enough to pass
constitutional muster under public forum analysis.

Courts have held that when the cost to the speaker of using

the forum location is made to depend not only on expenses for which she may be directly responsible, but also for the expenses potentially created by counterdemonstrators and others over whom she has no control, an unconstitutional "heckler's veto" can be created. See, e.g., Forsyth County, 505 U.S. at 134-35; City of West Haven, 600 F. Supp. at 1434 (invalidating provision requiring speaker to post bond to cover costs of police protection and maintenance). While courts have recognized the general principle that demonstrators may be required to pay for expenses or damage caused directly by them, they have carefully evaluated whether there is a likelihood such expenses would be incurred. In Mayor of Thurmont, for example, the court held that the town could not condition issuance of a permit upon an agreement to reimburse clean-up costs, in part because there was no indication the parade would cause the town to incur any clean-up costs. 700 F. Supp. at 286. A KKK representative promised that the KKK would clean up after itself, and the court stated that any "litter caused by spectators unaffiliated with the KKK should be the responsibility of the Town and not the KKK." Id. Implicit in the case was the suggestion that the KKK could have been required to compensate the town for any clean-up expenses resulting from its direct actions. See also Schneider v. State, 308 U.S. 147, 162 (1939) (if government's interest is preventing litter, then rather than banning leafletting, it should punish "those who actually throw papers on the street"); Wilson, 1993 WL

276959, at *4 (interest in protecting public property could be satisfied "with more narrow and less restrictive measures such as prudent site selection and policing").

Finally, the facts of this case distinguish it from <u>United States v. McFadden</u>, 71 F. Supp. 2d 962, 967 (W.D. Mo. 1999), <u>aff'd</u> <u>sub nom.</u> <u>United States v. Nenninger</u>, 351 F.3d 340 (8th Cir. 2003), which involved a First Amendment challenge to a Forest Service regulation. There, the defendants -- members of the loosely-organized Rainbow Family -- held a gathering (without permission) within a National Forest and were charged with conducting an assembly without a permit. They challenged the regulation under which they were charged as unconstitutional because, in part, it required permit applicants to assume liability for damage caused to the federal property. The magistrate judge rejected defendants' argument that "damage could conceivably be caused by others on the land where the Rainbow Family was permitted to gather" as "sheer speculation." <u>Id.</u> Here, it is a well-founded concern. A rally or protest concerning a somewhat controversial political issue held on a busy federal property in downtown Boston is completely unlike a Rainbow Family gathering within a National Forest; it is likely to attract onlookers, unaffiliated sympathizers, and perhaps counterdemonstrators, any of whom might cause damage or injury for which the permit applicant would then be liable. Furthermore, the Clause reaches well beyond the regulation in

McFadden, and potentially makes the applicant liable for such
events as a counterdemonstrator intentionally assaulting an
innocent bystander.

The scope of GSA's "protecting public property"
justification to support the Clause does not follow this
distinction in the case law.  A narrowly tailored provision
limiting the permittee's liability to harm caused by the actions
of the permittee, the sponsoring organization, and individuals
acting pursuant to the organizer's authority would be more
appropriate, because it would not expose the permittee to
liability for the actions of people not subject to the
organizer's control.  The Supreme Court has long held that
"[c]ivil liability may not be imposed merely because an
individual belonged to a group, some members of which committed
acts of violence."  NAACP v. Claiborne Hardware Co., 458 U.S.
886, 920 (1982).  It follows a fortiori that liability may not be
imposed merely because an individual belonged to a group whose
opponents committed acts of violence.

GSA's legitimate goal in seeking to avoid damage to public
property can be achieved by means that work a significantly
lesser burden upon free speech rights.  Rather than imposing
blanket liability on the permittee for the actions of potentially
unaffiliated third parties, GSA can pursue existing civil and
criminal sanctions against the individuals who actually damage

public property.  See Martin v. City of Struthers, 319 U.S. 141,
148 (1943) (ordinance banning door-to-door distribution of
literature was not narrowly tailored; "city can punish those who
call at a home in defiance of the previously expressed will of
the occupant and, in addition, can by identification devices
control the abuse of the privilege by criminals posing as
canvassers"); E. Conn. Citizens Action Group, 723 F.2d at 1057
("state's concern [regarding] damage claims from neighboring
landowners . . . may be addressed through existing civil and
criminal sanctions for trespassing, vandalism, and so on");
Collin, 578 F.2d at 1209 (government could more narrowly serve
its interest in safety by criminalizing conduct that causes
injury to persons or property and by arresting violators).

     By focusing upon traditional particularized mechanisms for
protecting public property, GSA can not only more narrowly tailor
the financial burden on First Amendment expression, but can also
avoid Claiborne's prohibition against vicarious liability for
nonviolent exercise of protected activity.  Accordingly, I
conclude that the Clause is not narrowly tailored to serve the
government's interest in protecting public property.

               iii. Shielding Government from Liability

     Ultimately, GSA seeks through its Clause to shift to users
the costs of maintaining a designated public forum.  But the
record before me demonstrates that the provision is, in actual
operation, largely bureaucratic paper pushing in this regard.

GSA acknowledges that it has never enforced the provision to hold any permit holder personally liable for any damage.[27]  Moreover, it appears that GSA not only does not enforce its Clause -- it does not take any care to see that it is enforceable.  There is evidently no examination of the creditworthiness of the applicant, making it possible to evade the purpose of the requirement by simply finding a judgment-proof individual to sign the permit application.  This apparently is what occurred in Chicago, where the Americans to Keep Elian Free rally organizers had a judgment-proof member of their group execute the Clause.

But bureaucratic paper pushing and associated hollow threats can nevertheless chill the exercise of First Amendment rights. The prospect remains that GSA may at some point for the first time actually pursue a signatory for costs over which the signatory has no direct control.  This prospect may cause those like Van Arnam, who are indisposed to engage in the ruse of finding a judgment-proof signatory, to draw back from the public forum GSA has designated.

To the degree that the Clause is meant to impose additional responsibility beyond what the traditional principles of tort law provide, it is tailored to take public responsibility out of the

---

[27]In 1985 GSA apparently did apply funds from a $1000 guarantee deposit it held to pay for clean-up costs following a sports event on federal property in Philadelphia.  The event sponsors signed the Clause and GSA had an endorsement on a ten million dollar event insurance policy in connection with the event, though it did not make a claim on the policy.

public forum.  But cities do not condition use of public ways on the execution of indemnification provisions.  The traditional principles of tort liability, including vestiges of sovereign immunity and other specific limitations on governmental liability, are the accepted accommodation between the traditional availability of public amenities, and the public's concern that the sovereign not be unduly burdened for providing them.[28]  As the Second Circuit held in <u>Eastern Connecticut Citizens Action Group</u>, the narrow tailoring requirement is violated if the government simply assumes that the ordinary mechanisms for

---

[28]<u>But see</u> <u>Plain Dealer Publ'g Co.</u>, 486 U.S. at 796-97 (White, J., dissenting) (suggesting that insurance and indemnification requirements are legitimate means by which municipality can shift liability, and noting that newspaper in that case conceded that, such requirements, if applied equally to all users, would be constitutional).

protecting itself from liability will fail, and imposes speech-burdening conditions as a matter of course:

> While the state has a legitimate interest in protecting itself from liability for injuries associated with the use of its property . . . . [a]bsent a showing that those carefully-crafted remedies [marchers' efforts to minimize risk of injury or damage, waivers of claims against the state, and existing civil and criminal sanctions for trespassing, vandalism, etc.] are unavailing in this instance, the state may not insist upon broader restrictions which substantially infringe constitutional rights.

723 F.2d at 1056-57; see also Mayor of Thurmont, 700 F. Supp. at 286 ("The cost of police protection may not be imposed on those who wish to exercise their right to freedom of expression."); cf. Stonewall Union v. City of Columbus, 931 F.2d 1130, 1135-36 (6th Cir. 1991) (upholding regulation that charged parade applicants for police protection based on purely objective factors such as proposed route and number of participants, and distinguishing cases where police protection fee was based in part on anticipated hostile reaction), cert. denied, 502 U.S. 899 (1991).

Furthermore, even where there is evidence that injury or damage by hecklers is likely to occur, it is inappropriate to shift the expense of that damage onto the permit applicant. Where a belligerent counterdemonstration is expected, the insurance industry is likely to refuse to issue insurance at all, see, e.g., Mayor of Thurmont, 700 F. Supp. at 284 ("the insurance industry will not sell insurance to the KKK due to its perceived reputation and perceived fear of disturbance"), and the Clause

has a substantial in terrorem effect.  In such cases, the proper
role of government -- which has a monopoly on the lawful use of
force -- is to protect demonstrators, counterdemonstrators,
onlookers, and property.  It is not to hope that high ex ante
costs will deter the demonstrators from speaking at all.  Cf.
City of West Haven, 600 F. Supp. at 1435 (requirement of bond to
cover costs for police protection "allows a hostile group
effectively to deny a speaker's constitutional rights by making
the exercise of those rights prohibitively expensive").

In sum, the government cannot properly reallocate its due
burden by conditioning use of public facilities on the assumption
of that burden by others without narrowly tailoring the
reallocation to minimize the chilling effect on constitutional
rights.  There is no indication in this record that GSA has done
so with its all-encompassing Clause.

### iv. Disparate Impact on the Indigent

No doubt because the Clause is at once all encompassing and
imprecise, there is no recognition of the need to accommodate
permit applications by those with limited means.  In the absence
of something other than an in terrorem sense of what the
financial obligation might be for executing the Clause, a
putative permittee can make no judgment about, and seek no relief
from, her inability to afford the cost of using the public forum.

Yet case law has recognized an indigency exception from financial responsibility provisions in applications to use public fora.

To be sure, even when would-be permittees show that either they could not afford or could not obtain liability insurance required as a condition of use, courts often emphasize that they are not reaching the issue of whether steep (and perhaps content-discriminatory) fees and premiums are unconstitutional in every case. See, e.g., E. Conn. Citizens Action Group, 723 F.2d at 1057 ("Nor do we suggest that DOT's fee and insurance requirements would not be valid when reasonably applied."); Collin, 578 F.2d at 1208 ("[W]e do not need to determine now that no insurance requirement could be imposed in any circumstances, which would be a close question, in our view.").

But in virtually all such cases, the courts have concluded that the requirement was unconstitutional as applied to the plaintiff unable to pay. See Cent. Fla. Nuclear Freeze Campaign v. Walsh, 774 F.2d 1515, 1523 (11th Cir. 1985) (holding that $1,436 fee, without indigency exception, for a demonstration in city streets and parks was unconstitutional because "indigent persons who wish to exercise their First Amendment rights of speech and assembly and as a consequence of the added costs of police protection, are unable to pay such costs, are denied an equal opportunity to be heard"), cert. denied, 475 U.S. 1120 (1986); E. Conn. Citizens Action Group, 723 F.2d at 1053, 1056-57 ($200 fee and insurance requirement were not narrowly tailored as

applied to those "demonstrably unable to comply and whose speech is therefore chilled by state action"); <u>Wilson</u>, 1993 WL 276959, at *4 (insurance requirement was not narrowly tailored as applied to persons "who are financially and otherwise unable to obtain coverage"); <u>Mayor of Thurmont</u>, 700 F. Supp. at 286 (requirement of reimbursing town for police protection and cleanup, even if valid in some cases, was unconstitutional because it was not "waived or modified for indigents"); <u>City of West Haven</u>, 600 F. Supp. at 1435 (bond requirement was unconstitutional as applied to those unable to obtain a bond); <u>see also</u> <u>Lubin v. Panish</u>, 415 U.S. 709, 718 (1974) ("[I]n the absence of reasonable alternative means of ballot access, a State may not, consistent with constitutional standards, require from an indigent candidate filing fees he cannot pay."); <u>but see</u> <u>Stonewall Union</u>, 931 F.2d at 1130-37 (holding that lack of indigency exception to permit fee for parade in streets was saved by availability of free parade permits for sidewalks or parks).

The record in this case indicates that, while Van Arnam is not "indigent," acceptance of the <u>ex ante</u> financial burden of a $1,000 (or greater) insurance premium, or the more diffuse (but potentially far greater) burden of unlimited personal liability, would be a serious financial burden for her -- one that could (and in fact did) completely deter her from speaking on federal

property.[29]  I therefore conclude that the Clause -- whether or not it is equivalent to an insurance requirement -- imposes financial demands that burden the expressive activities of those without sufficient financial means more than is necessary to achieve legitimate governmental interests.

### V.  CONCLUSION

For the reasons set forth more fully above, I conclude that:

1.    Van Arnam has standing to challenge the Clause, and her challenge is not now moot;

2.    The challenge of Americans to Keep Elian Free is moot;

3.    JFK Plaza is a traditional public forum;

4.    The Clause is content-neutral;

5.    The Clause does not create undue administrative discretion;

6.    Adequate alternatives for communication exist;

---

[29]Whether she is "indigent," and how to draw that line, is in my view not important for purposes of my analysis.  While one who literally cannot come up with the money under any circumstances whatsoever is <u>completely</u> deterred from speaking, one who could perhaps pay the money at significant personal sacrifice is <u>substantially</u> deterred from speaking.  I do not find it especially compelling to speculate about whether Van Arnam might have been able to pay for a liability insurance premium if she moved to a smaller apartment, or stopped going to restaurants for a year.  <u>See</u> Goldberger, 62 Tex. L. Rev. at 413-14 ("[P]ecuniary burdens work to discourage speech even when the burdens are not obviously prohibitive.").  Instead, I find, based on her 1999 and 2000 income, that it would have been a substantial hardship to pay a liability premium or to bear personally the risk of the Clause.  While the concept of inability to pay is not precisely defined, many federal agencies have developed procedures for determining whether a person is unable to pay a given fee.  However, GSA has not done so here.

7.  The Clause is not narrowly tailored to serve a significant government interest;

8.  Even if the Clause would be narrowly tailored as applied to some persons, it is not narrowly tailored as applied to persons, such as Van Arnam, who cannot reasonably afford the financial demands it makes.

I therefore ORDER as follows:

1.  Judgment is hereby entered for Van Arnam on Count I of her complaint, declaring that the indemnification/hold harmless provision of GSA's public use permit violates the First Amendment as applied to her.

2.  Judgment is entered for defendants on Count II of Van Arnam's complaint (alleging a facial violation of the First Amendment).

3.  Van Arnam shall, within thirty days from the entry of final judgment, submit an application for fees and expenses.

/s/ Douglas P. Woodlock

_____
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE